# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 05-03032-01-CR-S-RED |
| ROGER E. WALL, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. A hearing was held before the undersigned on September 8, 2005. Defendant was represented by Cynthia McPherson, and the government was represented by Richard Monroe, Assistant United States Attorney.

Defendant moves the Court to suppress all evidence seized pursuant to search warrants issued in this Court on December 8, 2004, and December 13, 2004.

The government first called Special Agent David Burlew of the FBI. According to the testimony of Agent Burlew, he was the affiant and made the application in support of the two search warrants in this case. The initial application was made on December 8, 2004. Prior to that time, he had interviewed Tea Huff on November 9, 2004. He put information from that interview and from an interview with Christy Coats, conducted on November 15, 2004, in the affidavit. From these interviews, he believed there were pornographic tapes involving defendant. On November 16, he received information about possible evidence related to this investigation in Ava, Missouri.

1

Dorothy Drager telephoned the FBI office in Springfield, Missouri, with information she believed might be beneficial to the FBI.. She stated that she was aware of the investigation of defendant, and if the FBI would go to 611 E. Washington in Ava, they could find evidence hidden inside a closet. Agent Burlew wrote a report regarding this telephone call, and also included the information from Ms. Drager in the affidavit. When he acquired this information, he contacted the chief division counsel for the FBI in Kansas City, Missouri, Kenneth Steck. Mr. Steck indicated that if the persons at the residence would voluntarily surrender the evidence, they should seize it and make an application for a search warrant later. Agent Burlew recontacted Dorothy Drager and spoke to her at that time. He also included information regarding that telephone conversation in his affidavit. The officer went to 611 E. Washington on November 16, 2004. ATF Special Agent Angie Kaighin accompanied him. Joan Rackley was there. He explained to her why they were there, telling her that he had spoken to her sister and what Dorothy had told him. He asked for verbal and written consent to search her residence, and she provided both. Ms. Rackley said the two packages were in Granny's closet. Granny is her deceased mother. At the time she spoke to him, she did not seem disoriented or confused. She signed a standard consent to search form. No threats or promises were made. She requested that they remove the envelopes. In addition to what was in the closet, they asked if defendant had hidden anything else, and she said he had not. He asked if she had anything else in her possession, and she indicated that she had a handwritten note from defendant, which he had asked her to rewrite in her own handwriting and provide to local media speaking favorably of him. According to the officer, Ms. Rackley told them that defendant came by about a week before and asked her if he could drop off a package and place it inside Granny's closet. She indicated she told her sister about this the day before, on November 15. He documented his interview with Ms.

2

Rackley, and included this information in his affidavit. The officer believed Ms. Rackley was aware of who he was and what he was asking for when he was at her house. Agent Burlew took the two manila envelopes and the letter and wrapped them in newspaper to try to preserve the outside of the envelopes for any latent fingertips. He then placed the articles in a government car, and drove back to his office in Springfield, Missouri. He carried the items into his office, with his hands underneath the newspaper. The smaller envelope was on top and the bigger one was on the bottom. As he walked into his office, he stubbed his toe on the desk chair. This caused him to stumble, and the top envelope fell off and hit his desk top. When it hit the desktop, a VHS recording tape came about three-fourths of the way out of the envelope. He put latex gloves on, and as he tried to push the VHS tape, which was inside a cardboard container, back into the envelope, it met with some resistance. Part of the envelope was stapled shut, so he opened it enough to maneuver the tape back inside the envelope. As he was putting it back in, he noticed some more items inside the envelope. He then called the Assistant United States Attorney handling the case to report the incident. He also called Chief Division Counsel, Mr. Steck, and reported dropping the package to him. Mr. Steck told him to document the incident, which he did, and then make efforts to obtain a search warrant for the contents of the envelopes. The officer filed a report regarding dropping the smaller envelope, and documented that he made the two telephone calls regarding the incident. He identified a photograph, which depicts the way they found the flap on the envelope with one of the staples loose. Agent Burlew reinterviewed Tea Huff on November 21, 2004, because he did not believe they had enough information to obtain a search warrant at that point. He interviewed her telephonically, and included this information in the affidavit as well. He also became aware of grand jury testimony from Christy Coats, on November 18, 2004. Ms. Coats, who was defendant's former live-in

girlfriend, provided information that Tea Huff had a former boyfriend named "Mike." Ms. Coats testified that she recalled seeing Tea and Mike having sex, and that she and defendant had viewed this video before. Agent Burlew included a portion of Ms. Coats testimony in his affidavit for the search warrant. He attempted to find the videotape, and attempted to find "Mike." He interviewed Michael Louck on November 30, 2004, and included information from that interview in his affidavit. Agent Burlew testified that he did not look at any of the other contents of the smaller envelope before obtaining the search warrant. Rather, he just viewed the exterior packaging of the VHS tape. The officer included the information about dropping the envelope in his application for the search warrant.

The first search warrant was issued on December 8, 2004. Law enforcement officers proceeded to open the packages and viewed the videotapes, which depicted Tea Huff having sexual intercourse with Michael Louck. This was as described by Mr. Louck, Ms. Huff, and Ms. Coats. On a smaller tape, defendant was depicted. The larger envelope, which was completely sealed with two or three staples and taped shut, was not opened until the search warrant had been issued. It held two Kodak video cassette recording tapes. He viewed those after the first search warrant was issued. Both tapes had the same video, depicting Tea Huff recording herself appearing to have telephone sex. It also held the original hard drive from a computer, two recordable compact discs, and a photograph of a young female.

On December 17, Agent Burlew applied for a second search warrant because he wanted to obtain data from the computer hard drive found pursuant to the first search warrant. He denied that he knowingly misled the Court in applying for these search warrants, and believed there was probable cause to support their issuance.

4

On cross examination, Agent Burlew testified that Ms. Drager said the FBI should look for two envelopes or packages, but did not say she had any idea what was in the envelopes, nor did she describe them. Ms. Drager had no personal knowledge about the envelopes or about defendant placing them there; all the information came from her sister, Joanne Rackley. According to Agent Burlew, Ms. Drager felt that they were being used to hide evidence from the FBI. Ms. Rackley mentioned that one of the packages had been put there in 1998. The officer acknowledged that before he went to the Rackley residence, he knew he was going to seize evidence, and he did not take any evidence bags with him. He admitted that this resulted in a situation where the evidence might be accidentally opened. He had not heard that Ms. Rackley was incompetent. He briefly discussed Granny's bedroom with her, and she said Granny had died five years earlier. He did not think the door into the bedroom was locked. Ms. Rackley said she had never looked in the envelopes.

Agent Burlew testified, that in regard to the condition of the smaller envelope, one staple was clearly stapled, but the other side of the envelope had pulled through the staple, although the staple was still affixed When the smaller envelope fell, it landed on his desktop, and the tape protruded about three-fourths of the way out. He put on latex gloves, and tried to put the tape back in, but he met with some resistance. When he looked inside to see what was causing this, it looked like the impediment was the plastic container of an eight-millimeter tape. He removed the larger tape in order to move the eight-millimeter over and get the larger one back in. In doing so, he acknowledged that he could see the contents of the envelope through the small opening.

Agent Burlew followed up with more interviews to establish probable cause for the search warrant. He testified that he would have had an idea of where to follow up before the envelope came

5

open because of Ms. Coats' testimony before the grand jury and the information from Tea Huff about a sex tape. During the ensuing 22 days before the search warrant was obtained, he learned the last name of Michael Louck, and he tracked him down for a lengthy interview, in which he confirmed that Ms. Huff was sixteen years old.

Pursuant to the first search warrant, the officers reviewed everything except the hard drive and a CD. The incriminating evidence which defendant was charged with was obtained from the first search warrant. Agent Burlew testified that Ms. Drager told him that her mother had been a very close friend of defendant's and would have been alive when the first envelope was placed there. The officer admitted that at the time he seized the two envelopes, he did not have any idea of the incriminating nature of the objects he was seizing, and he had no reasonable probable cause that the packages contained contraband. Agent Burlew also testified that he had personally interviewed Ms. Coats on the 15th of November, which was the day before he went to Ms. Rackley's house, and she told him at that time about the sex tape. The grand jury testimony where she actually talked about the sex tape was on the 18th.

The next witness for the government was Kevin Steck, a supervisory special agent for the FBI. At the time of this incident, he was Chief Division Counsel for the FBI in Kansas City. Mr. Steck received a telephone call from Agent Burlew early in November. He said he had a case involving a judge where they obtained information about some envelopes that purportedly contained videotapes with either child pornography or sexual exploitation of a child depicted. Mr. Steck told the officer that if the person had care, custody, and control over the items, that individual could give consent. On November 16, at 8:30 p.m., Agent Burlew called him at his residence. He was concerned because he had seized the envelopes and one of them fell off his desk or dropped on the

6

floor and the contents spilled out because it was not properly sealed. Mr. Steck told the officer to document the incident, and to call the Assistant United States Attorney working the case. They discussed whether a search warrant would be necessary for the contents of the envelope that had come open. Agent Burlew told him that one of the envelopes was carefully sealed, and the other may have been opened before and was in a condition where it could come open again.

On cross examination, Mr. Steck testified that he was giving legal advice because he is an attorney and agents come to him for assistance. He stated that the issue presented to him was whether a third party had the care, custody, and control to give possession of the envelopes to the FBI.

Defendant called Forest Smith. He's an investigator in Douglas County. On May 10, 2005, he interviewed Ms. Rackley. She couldn't remember anything except that FBI agents came to her house and identified themselves, and asked her if someone left some manila envelopes there. She said they had, and they wanted to know if they could see them. Ms. Rackley told Mr. Smith that she then went to the bedroom where the envelopes were stored and removed Granny first. Mr. Smith did not know that Granny had died five years earlier. Ms. Rackley had no recollection of giving consent or signing consent forms for the FBI. In his own estimation, she appeared to be confused and did not remember what had taken place before or after the agents were there.

On cross examination, the witness admitted that he did not show Ms. Rackley a copy of the consent to search form or Agent Burlew's affidavit.

Defendant contends that the removal of the two manila envelopes from Joan Rackley's residence was an unlawful seizure. It is defendant's position that Ms. Rackley lacked authority or control over the envelopes in question, beyond the mere act of storing them. He asserts that the

7

government must show that she had care, custody, and control of the items in order to have the legal authority to consent to the seizure and search of the envelopes. He contends that the government has failed to meet its burden to produce any evidence of Ms. Rackley's relationship with the envelopes beyond storage.

Further, defendant asserts that, even if Ms. Rackley had legal authority to authorize the search and seizure of the envelopes, the government has failed to show that her consent was knowing and voluntary because she did not have the mental competency to consent to any request by the agents who came to her house. He relies on medical records from September 2003, which indicate that Ms. Rackley suffered from dementia, was disoriented, and demonstrated a failing memory. Additionally, defendant relies on the testimony of his investigator, Floyd Smith, who indicated at the hearing that when he interviewed Ms. Rackley in May of 2005, she did not remember any conversation with FBI agents, did not recall signing any waivers or releases, and stated that she had to remove her mother, who had been gone five years, from the bedroom so the agents could go in that room to remove the envelopes. Mr. Smith testified that it was his opinion that Ms. Rackley appeared confused and did not remember what had occurred either before or after the agents were at her home.

It is also defendant's position that the evidence must be suppressed before the Court reaches the issue of the validity of the search warrants. Regarding the first search warrant, however, defendant asserts that any analysis of the validity of the search warrant must take place based solely on the probable cause the agent had before "breaking into the first envelope." [Post-Hearing Brief, at 7]. He contends that all the agents knew was that they had two plain manila envelopes, and that even after Agent Burlew saw the VHS tape, the eight-millimeter tape, and the CD-ROMs in the

8

envelope, he still did not believe he had probable cause for a search warrant. Defendant contends that during the next twenty-two days, Agent Burlew's investigation produced no new evidence other than what he already had available to him, and that he focused on a tape, which he denies viewing.

The government asserts that the initial seizure was lawful because the envelopes were obtained by written consent of Ms. Rackley, the owner and occupant of the residence. It is asserted that her consent, both written and oral, was valid, and that the removal of the items she wanted to have removed was lawful. The government contends that defendant had no expectation of privacy in the external characteristics of the envelope. It distinguishes the cases relied upon by defendant on the basis that these cases involve the seizure and search of the contents of packages or baggage, not merely the seizure of a package. It is also contended by the government that defendant lacks standing to challenge the initial seizure. This argument is made on the basis that defendant was not present at the time of the seizure, nor did he live at the Rackley residence.

The Fourth Amendment protects against both unreasonable searches and unreasonable seizures. In United States v. VaLerie, 424 F.3d 694, 706-09 (8th Cir. 2005), the Eighth Circuit recognized the interests implicated by a seizure and by a search. The Court held that:

> According to the Supreme Court, a Fourth Amendment *search* "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). On the other hand, a Fourth Amendment *seizure* of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652.

An individual challenging a search and seizure can establish a sufficient interest to constitute standing "if he has an adequate possessory or proprietary interest in the place or object searched" and if this assertion of a property interest is supported by an expectation of privacy. United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995), citing United States v. Stallings, 28 F.3d 58, 60 (8th

9

Cir. 1994). From the facts that were adduced at the hearing in this case, the Court finds that defendant has established that, based on his claim of ownership of the envelopes in question, he had an adequate proprietary and privacy interest in them, sufficient to establish standing. The evidence established that defendant was a long-time friend of Ms. Rackley's mother; that he had stored a well-sealed envelope at her home since 1998; that in 2004, he contacted Ms. Rackley to store another envelope; and that she accepted his request to do this. Further, the Rackleys apparently acted with the intent to preserve defendant's privacy in these items by storing them in a bedroom closet out of view, where the contents were not disturbed. There is evidence elsewhere in this case that defendant was instructed to preserve these items after an earlier investigation. The obvious implication is that he asked that these items be stored at the Rackley residence for safe-keeping and that, while he intended that they remain in the possession of the Rackleys for an undetermined period of time, he had relinquished no ownership interest in them.

The government argues that because defendant was not at the residence at the time of the search, nor did he live at the Rackley residence, he lacks standing to challenge the search. Defendant challenges this assertion on the basis that the issue is not whether the agents could search the residence, which he does not contest, but rather, whether they could seize property belonging to him, which had been stored at that residence, with Ms. Rackley's consent. It is also defendant's contention that it is inconsistent for the government to argue that he does not have standing to challenge the seizure in this case because he is charged with possession of child pornography, and the very nature of the charge alleges that he has a possessory interest in the item seized. The Court agrees with both propositions. See United States v. Kelly, 529 F.2d 1365, 1370 (8th Cir. 1976) (holding that defendant has standing where he exhibits a reasonable expectation of privacy and

10

where the possession of the seized evidence is itself an essential element of the offense). Based on applicable case law and the facts of this case, the Court finds that defendant has standing to challenge the seizure of the envelopes at issue.

Turning next to the issue of Ms. Rackley's consent, the government may obtain consent for a warrantless search or seizure from a third party who possesses authority and control over the premises. United States v. Fleck, 413 F.3d 883, 891 (8th Cir. 2005). In order to be valid, consent must be voluntarily given. United States v. Escobar, 389 F.3d 781, 784 (8th Cir. 2004). The government has the burden of proving, by a preponderance of the evidence, that consent was voluntarily given. United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997). Consent is voluntary if it is the product of a free choice by its maker, rather than the product of duress or coercion. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). 'This determination depends on the totality of the circumstances in a particular case, including characteristics of the accused and the details of the interrogation." Id. at 380. Factors relating to the characteristics of the individual giving consent include age, general intelligence and education, whether he or she was under the influence of drugs or alcohol, if Miranda rights were read prior to consent, and whether the defendant had experienced prior arrests and is aware of the protections the legal systems affords to the accused. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted).

Defendant contends that Ms. Rackley was not mentally competent to give consent. It is asserted that she was diagnosed with dementia as early as 2003, and that she was found to be legally incompetent in 2005. Defendant also relies on the testimony of Floyd Smith to support his claim that Ms. Rackley was incompetent to consent to the seizure.

11

Initially, it should be noted that the information attested to by Mr. Smith at the hearing is not relevant to Ms. Rackley's mental health at the time the agents came to her residence. Mr. Smith interviewed her in May of 2005, and the contact with Agent Burlew took place in December of 2004. Further, there is no evidence to support a finding that Mr. Smith, despite his experience as an investigator, is an expert in mental health, or is otherwise qualified to render a retrospective opinion regarding her state of mind at the time of the seizure. By the same token, the medical records submitted by defendant are from September of 2003, which was fourteen months before the incident in question. At that time, while there were complaints of dementia, disorientation and forgetfulness, no action was taken to have Ms. Rackley declared incompetent at that time. In fact, she apparently continued to live on her own for the next year or more, and her sister, Dorothy Drager, appeared comfortable enough with her mental state to send the FBI to her house without another family member present for the purpose of obtaining the packages left there by defendant.

According to the testimony of Agent Burlew, Ms. Rackley was responsive and appropriate, had no problem providing verbal consent or executing the written consent to search, and was able to advise them of the location of the envelopes. Further, she was evidently clear in her request that they should remove the items from her home. According to Agent Burlew, Ms. Rackley did not seem disoriented or confused. He stated that he made no threats or promises. Additionally, when asked if defendant had hidden anything else, she was able to respond appropriately. It was also the officer's testimony that Ms. Rackley explained the circumstances of how she came to be in possession of one of the envelopes, telling him that defendant came by about a week before and asked her if he could drop off a package.. Finally, Ms. Rackley indicated that she told her sister,

12

Dorothy, about this the day before, on November 15.

Based on the entirety of Agent Burlew's testimony, it appears that Ms. Rackley was rational, appropriate in her responses, understood what was occurring, was able to explain her possession of defendant's property, told the officers where it was located, and expressed her desire to have it removed. She gave verbal consent and executed a written consent to search form. There is no evidence to suggest that Ms. Rackley was coerced in any manner to give consent against her will. Under the totality of the circumstances standard, the weight of the evidence supports a finding that Ms. Rackley's consent was voluntarily given.

The Court next turns to the question of the scope of Ms. Rackley's authority to consent to the search. It is defendant's position that she only had authority for the mere act of storage of the envelopes, and that she did not have care, custody and control of them, sufficient to afford her the authority to consent to the seizure, in reliance on James v. United States, 353 F.3d 606, 613 (8th Cir. 2003). As the government contends, however, James is not applicable to this case, given that it involves the authority of the consenting party to consent to an actual search of the contents of computer discs, while the instant case involves only the seizure of the envelopes, and not a search of their contents. A careful review of James indicates that, although it involves consent by a bailee for a search of held items, its holding has not been extended to situations involving the seizure of items being maintained by a bailee. Further, the James court was influenced by the fact that the officers in that case had information that the friend did not have, which was that "his *actual* authority had changed." James, 353 F.3d at 615 [emphasis in original]. The officers knew, based on their interception of a letter, that the bailee only had the authority to scratch and destroy the discs. "This last fact is critical." Id. The Court held that, "[i]t cannot be reasonable to rely on a certain

13

theory of apparent authority, when the police themselves know what the consenting party's *actual* authority is–in this case, not to store the discs, but to destroy them. The standard of reasonableness is governed by what the law enforcement officers know, not what the consenting party knows." Id.

In the instant case, the action at issue is the seizure of the envelopes, to which Ms. Rackley consented. Further, she specifically requested that the envelopes be removed from her residence because she and her sister expressed the concern that they might be relevant to an on-going investigation involving defendant. The proper inquiry for the Court to make is whether it was reasonable for the officers to rely on her apparent authority to consent. James, 353 F.3d at 615. "[W]ould the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?" Id. [citations omitted]. In this case, the officers relied on the unsolicited call from Ms. Drager, which advised them that a package belonging to defendant had been stored at her sister's home for at least six years, with another recently being taken there; the information that these packages might contain information regarding their pending investigation; the fact that they were requested to go to the home because the homeowner wanted these items removed; and once there, the fact that Ms. Rackley was willing to consent to their seizure and advise them where the items were kept. Based on the long-standing rule of law that an officer's belief in a third-party's apparent authority to give consent must be reasonable, the Court reaches the conclusion that it was reasonable for the officers to rely on Ms. Rackley's authority, as the homeowner, to consent to the search of the premises and the seizure of the envelopes.

Defendant contends that the evidence should be suppressed before the Court ever reaches

the issue of the search warrants in his case. It is his position that the government illegally searched the smaller envelope when the VHS tape protruded after an "accidental stumble," and Agent Burlew replaced it, allegedly thoroughly searching through the envelope in the process of replacing the tape. The Court is satisfied, however, based on the testimony adduced at the hearing, that this incident was wholly inadvertent. It is clear that the incident was caused in part by the fact that the envelope was not well-sealed. Based on the officer's credible testimony, he only moved items in the envelope to be able to place the VHS tape back inside. The officer took precautions to the best of his ability to preserve the integrity of the contents of the envelope after they were inadvertently exposed. Not only was the officer's testimony convincing and credible, the fact that he immediately called his supervisor, Mr. Steck for legal advice, and the U.S. Attorney who was working on the case, belies any argument that he deliberately inspected the contents of the envelope. There is simply no basis to reach that conclusion.

Defendant also argues that, because of the alleged accidental search, followed by the intentional search that occurred when Agent Burlew replaced the protruding tape, there would not otherwise have been probable cause to obtain the first search warrant. It is his position that the analysis of the validity of the first search warrant must be based solely on the evidence the agent had before breaking into the smaller envelope. He contends that the agent only knew that he had two plain manila envelopes in his possession at that time. He argues that without the warrantless search of the smaller envelope, Agent Burlew would have had no probable cause to obtain the search warrant. Defendant also asserts that Agent Burlew unjustifiably delayed seeking the search warrant for twenty-two days, and that the only follow-up investigation he conducted involved the contents of the tape he denied viewing.

15

A review of the evidence in this case satisfies the Court that there was probable cause to support the issuance of the search warrant executed on December 8, 2004. The law is well-established that probable cause to issue a search warrant exists when the affidavit, under a common-sense evaluation, sets forth sufficient facts that would lead a reasonable person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238-39 (1983); United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995).

In this case, in his affidavit in support of the first search warrant,[1] Agent Burlew included information regarding the seizure of the envelopes; the fact that one of the envelopes contained a VHS tape, a smaller video cassette, and a CD-ROM disc; information from his interview with Tea Huff regarding pornographic tapes that were made involving her, a minor; information from Christy Coats regarding pornographic tapes that she testified about before the grand jury, and which he also interviewed her about; and an interview he had with Michael Louck. Regardless of defendant's efforts to suggest that no information was obtained other than through illegal means, the record simply does not support this conclusion. Further, the fact that Agent Burlew spent twenty-two additional days on the investigation only supports the probable cause finding in this case. Even if the Court were to find that the affidavit was lacking in indicia of probable cause, however, it is clear that the good faith exception under United States v. Leon, 468 U.S. 907 (1984), would apply.

Accordingly, the Court finds that defendant's motion to suppress must be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

---

[1] Defendant appears to have abandoned his challenge to the second search warrant because no evidence was obtained from the execution of that warrant for which suppression is being sought.

RECOMMENDED that defendant's motion to suppress evidence should be denied.

      /s/ James C. England
JAMES C. ENGLAND
United States Magistrate
Judge

Date: November 10, 2005